**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

|  |  |  |
|---|---|---|
| | : | |
| **RUSSELL L. WININGER, JR.,** | : | **CIV. ACTION NO.** |
| **PLAINTIFF,** | : | **3:02 CV 747 (WWE)** |
| | : | |
| **v.** | : | |
| | : | |
| **KEVIN SEARLES AND** | : | |
| **R. LEON CHURCHILL, JR.,** | : | |
| **DEFENDANTS.** | : | **July 20, 2006** |

**PLAINTIFF'S LOCAL RULE 56(a)(2) STATEMENT**

**A. 1.**    **Response to Defendant Spada's Statement of Undisputed Material Facts**

1. The plaintiff is an Officer for the Town of Windsor's (the "Town") police department (the "Department"). (Deposition of Russell Wininger, October 8, 2004, p. 17 [hereinafter "Pl. Dep., p._."], attached as Exh. A.)

**Response:** Admit.


2. He has worked in that capacity since 1995, and is a member of the Windsor Police Department Employees Association (the "Union"). (Pl. Dep., p.16.)

**Response:** Admit.


3. Kevin Searles is the Town's Chief of Police, and has served in that capacity since 1987. (Deposition of Chief Searles, October 5, 2004, p. 10 [hereinafter "Searles Dep., p._."], attached as Exh. B.)

**Response:** Admit.

4. R. Leon Churchill was the Town's Town Manager from January 1999 to June 2004.

(Deposition of R. Leon Churchill, December 3, 2004, pp. 7-8 [hereinafter "Churchill Dep.,

p._."], attached as Exh. C.)

**Response:** Admit.


5. While applying to the Department in 1995, the plaintiff interviewed with a member of the

Town's Human Resources Department as well as Chief Searles. (Pl. Dep., p. 13.)

**Response:** Deny. Plaintiff only recalled meeting with Chief Searles and Detective Jennifer

Swanson. He could not recall the other members of the oral interview board. (Pl. Dep., p. 13.)


6. He also had an oral board interview. (Pl. Dep., p. 13.)

**Response:** Admit.


7. The plaintiff testified that he initially was not selected for a position because his polygraph

examination revealed a discrepancy with the polygraph examination he had taken earlier with the

Coventry Police Department. (Pl. Dep., pp. 13-14.)

**Response:** Admit.


8. The plaintiff had told the Coventry Police Department that he had never been fired from a job.

(Pl. Dep., p. 14.)

**Response:** Admit.

PDF created with FinePrint pdfFactory Pro trial version http://www.pdffactory.com

9. However, he told the Windsor Police Department that he had been fired from a restaurant job in Hartford. (Pl. Dep., p. 14.)

**Response:** Admit.

10. The plaintiff accounts for this discrepancy by arguing that it was unclear whether he was actually fired or not. (Pl. Dep., p. 14.)

**Response:** Deny. Plaintiff explained the circumstances that made it unclear whether he was "fired". Specifically, the manager of the restaurant told Plaintiff and others that they were "fired". That manager, however, was fired days later for theft and the restaurant owners contacted Plaintiff and told him they were not "fired". Plaintiff explained that he never missed a paycheck from the restaurant and that Coventry confirmed his explanation before hiring him. (Pl. Dep., p. 14.)

11. After being refused the job with the Department, the plaintiff contacted Chief Searles to discuss his being turned down for the position. (Pl. Dep., p. 15.)

**Response:** Deny. Plaintiff was never refused the Windsor Police Officer job. Instead, his application stopped progressing due to the polygraph discrepancy. Under those circumstances, Plaintiff requested the meeting with Defendant Searles to explain the discrepancy about whether or not he was "fired" by the restaurant. (Pl. Dep., p. 15.)

12. The plaintiff testified that the Chief met with him and, after some discussion, the Chief elected to allow him to proceed with the next portion of the testing process. (Pl. Dep., p. 15.)

3

PDF created with FinePrint pdfFactory Pro trial version http://www.pdffactory.com

**Response:** Deny. After the discussion between the Plaintiff and Defendant Searles, Defendant Searles indicated that he would look into Plaintiff's explanation for the polygraph discrepancy. Thereafter, Plaintiff was permitted to proceed with the selection process. (Pl. Dep., p. 15.)

13. The plaintiff was hired and began with the Department in September 1995. (Pl. Dep., p. 16.)
**Response:** Admit.

14. The plaintiff testified that the Chief did "the right thing" after he brought the polygraph issue to the Chief's attention. (Pl. Dep., p. 16.)
**Response:** Admit. Plaintiff also testified that he did not think the process was "handled properly". (Pl. Dep., p. 16.)

15. On August 21, 1996, the plaintiff received a verbal reprimand from Captain Timothy Triggs for violating the department's pursuit policy and demonstrating "poor judgment." (Reprimand, Exh. 1 from plaintiff's deposition, attached as Exh. D; Pl. Dep., p.18.)
**Response:** Admit that Plaintiff received a verbal reprimand for violation of the department's pursuit policy. Plaintiff adds that he has also received a commendation for the manner in which he handled a pursuit situation.

16. On April 8, 1998, the plaintiff received another verbal reprimand from Captain Triggs for a "poor decision and put[ting] the police department in a very bad light" while making an illegal seizure of a motor vehicle. (Reprimand, Exh. 2 from plaintiff's deposition, attached as Exh. E. Pl. Dep., pp. 18-19.)

PDF created with FinePrint pdfFactory Pro trial version http://www.pdffactory.com

**Response:** Admit that Plaintiff received a verbal reprimand after it was determined that the search of a motor vehicle was improper, despite receiving permission from the driver's parents, and the use of a cash bond after arresting the driver was inappropriate. (Def. Ex. E). When that situation was later investigated by Captain Kearse, he admitted that he would have handled the search and arrest situation the same way as Plaintiff had, and he recommended that the reprimand be removed from Plaintiff's file. (Plaintiff's Ex. 4)

17. As a result of this incident, Captain Triggs removed the plaintiff from his role as Field Training Officer. (Pl. Dep, p. 69.)

**Response:** Admit. When that situation was later investigated by Captain Kearse, however, he admitted that he would have handled the search and arrest situation the same way as Plaintiff had, and he recommended that the reprimand be removed from Plaintiff's file. (Plaintiff's Ex. 4)

18. As a Field Training Officer, the plaintiff had patrolled with new officers, "teaching them, supervising them, correcting them." (Searles Dep., p. 55.)

**Response:** Admit.

19. In a written reprimand dated May 21, 1999, the plaintiff was cited for his "troubling" judgment in a situation where he left an assigned post without relief or permission. (Reprimand, Exh. 3 from plaintiff's deposition, attached as Exh. F; Pl. Dep., p. 19.)

**Response:** Admit that Plaintiff received a written reprimand when he left a private duty job to respond to a "serious motor vehicle accident." Plaintiff left the private duty job only after speaking with the construction contractor and ensuring they would use a flag man. Plaintiff left

5

PDF created with FinePrint pdfFactory Pro trial version http://www.pdffactory.com

the private duty job because only one on-duty officer was able to respond to the accident and

Plaintiff was the Lead Officer for the Regional Accident Reconstruction Squad. (Def's Ex. F)

When Captain Kearse later investigated that situation, he found that Plaintiff's unique skills were

called for at the accident, that Plaintiff had in fact contacted the department before leaving the

construction site to respond to the accident, that Plaintiff had not violated any departmental rules

with respect to the way he handled the situation, that Plaintiff had not exhibited an error in

judgment, and that the written reprimand should be removed from Plaintiff's file. (Plaintiff's Ex.

4)


20. On October 13, 1997, the plaintiff was again cited for "poor judgment" for drawing his

weapon when apprehending two motorcyclists for simple trespass. (Performance Report, Exh. 4

from plaintiff's deposition, attached as Exh. G; Pl. Dep. p. 20.)

**Response:** Plaintiff admits that he received a verbal reprimand after he brought the situation to

his supervisor's attention. (Def. Ex. G). Plaintiff adds that Officer James Bernard was promoted

to Sergeant after receiving a written reprimand for accidentally discharging a shotgun inside the

department's armory. (Plaintiff's Ex. 8).


21. On October 21, 1998, the plaintiff was issued a verbal warning for "failure to submit an

arrest warrant in a timely manner." (Memorandum, Exh. 5 from plaintiff's deposition, attached

as Exh. H; Pl. Dep., pp. 21-22.)

**Response:** Plaintiff admits that he received a verbal reprimand following a civilian complaint

that the Plaintiff had not prepared an arrest warrant for the civilian's son in a timely manner. The

reprimand further states that Plaintiff is a "valued employee of the Windsor Police Department"

6

PDF created with FinePrint pdfFactory Pro trial version http://www.pdffactory.com

and that Plaintiff was developing a follow-up system to prevent future problems. (Def. Ex. H).
Plaintiff further adds that Officer James Bernard was promoted to Sergeant after receiving a
written reprimand for damaging his police cruiser and deliberately failing to report that accident
to his supervisor. (Plaintiff's Ex. 8).

22. The plaintiff was cited in "problem" performance reports for three (3) further incidents from
1996 to 1998. These incidents included: sending an email to the Department in violation of a
superior's directive; his failure to turn on an audible siren when passing a vehicle on the way to a
burglary alarm (the performance report stated that he should use "better judgment within the
workplace"), and; improper storage of certain items in a cruiser, in violation of a superior's
directive. (Performance Reports, Exh. 6 from plaintiff's deposition, attached as Exh. I.; Pl. Dep.,
p. 22.)

**Response:** Admit. Plaintiff adds that he also received many more positive performance reviews
and commendations for his work as a Police Officer. For instance, he received a performance
report congratulating him for "giving it 110% . . . . putting forth a great effort . . . . frequently the
leader of the shift . . . ." Also, in April 1997, July 1997, October 1997 he received superior
ratings for "Problem Solving/Decision Making", throughout 1999 he received acceptable ratings
for "Problem Solving/Decision Making", and in October 2000 he again received a superior rating
for "Problem Solving/Decision Making". (Plaintiff's Exs. 1, 2, 3 and 5)

23. The above-mentioned reprimands, warnings and performance reports were given by a variety
of supervisors, and none came from Chief Searles or Mr. Churchill. (See Exhs. D through I.)

7

**Response:** Admit that the reprimands were processed through the chain of command. Plaintiff

adds that the positive performance evaluations and commendations were prepared by a variety of

supervisors and civilians. (Plaintiff's Ex. 1, 2, 3, and 5)


24. The plaintiff's January 1998 review cited "problems in decision making and judgment."

(Review, contained in Exh. 8 from plaintiff's deposition, attached as Exh. J; Pl. Dep., p. 37.)

**Response:** Plaintiff admits that the review noted the 12/15/97 and 10/13/97 incidents. Plaintiff

points out, however, that the review reflects far more positives than negatives. In April 1997,

July 1997, October 1997 he received superior ratings for "Problem Solving/Decision Making",

throughout 1999 he received acceptable ratings for "Problem Solving/Decision Making", and in

October 2000 he again received a superior rating for "Problem Solving/Decision Making". In

particular, Plaintiff was referred to as "an outstanding representation of this agency" with respect

to his appearance. Further, his work as an FTO, accident investigator, and taking on additional

responsibilities was noted. Plaintiff's "superior working knowledge of motor vehicle law" was

noted. The consistently "neat and grammatically correct" quality of his reports was noted.

Plaintiff's "high level of self initiated motor vehicle activity" that led to DUI, criminal and

narcotics arrests was also noted. Indeed, many of Plaintiff's reviews state that he should be

considered for promotion for patrol supervision and instructor/trainer duties. (Def's Ex. J;

Plaintiff's Exs. 1-3)


25. In his April 1998 review, the category of "Problem Solving/Decision Making" was scored

"below acceptable." (Exh. J; Pl. Dep., p. 40.)

PDF created with FinePrint pdfFactory Pro trial version http://www.pdffactory.com

**Response:** Admit that the April 1998 review currently states that Plaintiff scored a 3 out of seven in the Problem Solving/Decision Making area of the review form. Plaintiff notes, however, that the form originally states that Plaintiff received a score of 4, which is acceptable. Moreover, the comments for that entry have handwritten notations changing the observation from "acceptable" to "below acceptable". Finally, Plaintiff points out that while two of the thirty one areas of observation were changed from acceptable 4s to just below acceptable 3s, there are eight above acceptable 5s and three 6s. Indeed, Plaintiff received a 6 in "Attitude Toward Police Work" and a 6 in "Self Initiated Field Work". Finally, Plaintiff adds in 1999, he was rated as acceptable in "Problem Solving/Decision Making" and in 1997, as well as 2000, he received "superior" ratings in the area of "Problem Solving/Decision Making". (Plaintiff's Ex. 1-3)

26. His July 1998 evaluation stated: "on occasion during this phase Officer Wininger acted in an overzealous nature. The decisions he has made have not been of the best judgment." (Exh. J; Pl. Dep., pp. 42-43.)

**Response:** Plaintiff admits that those remarks are reflected in his July 1998 performance evaluation. Plaintiff adds, however, that while he receieved one "3+" regarding "Problem Solving/Decision Making", he received fourteen ratings of 5 or 6. Moreover, the evaluation notes that: "Ofc. Wininger continues to exhibit an outstanding attitude towards police work;" Russ is a tireless worker . . . ;" and, "Russ has continued to perform as a departmental leader in the area of self-initiated activity. Russ excels in this area . . . " Plaintiff also notes that prior to his promotion to Sergeant, Officer Freeman was similarly criticized: "Sometimes in his eagerness to do the best job possible, he makes mental mistakes . . . ." (Def's Ex. J; Plaintiff's Ex. 1-3)

9

PDF created with FinePrint pdfFactory Pro trial version http://www.pdffactory.com

27. The plaintiff's October 15, 1998 stated: "Officer Wininger has made some improvements in the area of decision-making. With this improvement it is still felt that there's work to be done in this area." (Exh. J; Pl. Dep., pp. 47-48.)

**Response:** Plaintiff admits that those remarks are reflected in his October 1998 performance evaluation. Plaintiff adds, however, that he received an "acceptable" 4 for "Problem Solving/Decision Making" and an above acceptable 5 or 6 in thirteen of thirty observation criteria. Moreover, the evaluation notes that: "Russ has maintained his high standard in the area of attitude towards police work. Off. Wininger leads the department in specialized duties . . . The department has benefited from Russell's eagerness to take part in many duties." It was also noted that "Off. Wininger has continued to be one of the top performers in the area of self initiated activity." Plaintiff also notes that prior to his promotion to Sergeant, Officer Freeman was similarly criticized: "Off. Freeman has shown some surprising decreases in performance areas . . . ." Likewise, prior to his promotion to Sergeant, Officer Francis received a written reprimand for insubordination. (Plaintiff's Ex. 10)


28. These reviews were completed by a variety of supervisors, none of whom included Chief Searles or Mr. Churchill. (See Pl. Dep., pp. 37-49.)

**Response:** Plaintiff admits that the forms were completed by a variety of supervisors that submitted them through channels. Plaintiff adds that the criticisms of other officers prior to their promotions to Sergeant were also made by a variety of supervisors. (Plaintiff's Exs. 1-5)


29. Under the collective bargaining agreement between the Town and the Union (the "CBA"), "the Town reserves the right to determine the method, means and personnel by which the Town's

10

PDF created with FinePrint pdfFactory Pro trial version http://www.pdffactory.com

operations are to be conducted." (Copy of CBA, Exh. C from Chief Searles' deposition, Article I,

Section II, attached as Exh. K; Pl. Dep., p. 53.)

**Response:** Plaintiff admits that the quoted language is reflected in the CBA.


30. According to the applicable Town of Windsor Departmental Regulation, candidates for

Department promotions are evaluated using a three (3) factor test. (Copy of Regulation attached

as Exh. L; Searles Dep., pp. 44, 64.)

**Response:** Admit.


31. First, candidates are scored on a written examination, which comprises fifty percent (50%) of

their overall score. An oral examination before a panel of approximately ten (10) outside law

enforcement officials makes up twenty-five percent (25%) of the score, and an "employment

profile" makes up the remaining twenty-five percent (25%). (Exh. K.)

**Response:** Admit.


32. The employment profile score is arrived at by an examination of the applicant's personnel

files maintained within the Department. (Searles Dep., pp. 40-41.)

**Response:** Deny. Departmental Regulation II-B1.2 defines "Employment Profile" as "A

comprehensive supervisory evaluation of a candidate's job performance, work habits, work

history, and job related attitudes for use as a mechanism in determining a candidates relative

suitability for either promotion or initial employment with the Town."

11

PDF created with FinePrint pdfFactory Pro trial version http://www.pdffactory.com

33. The written and oral examinations are scored by an outside consultant, while the employment profile score is computed by the Town's Human Resources department. (Searles Dep., p. 39.)

**Response:** Admit.

34. Based on these three (3) components, the candidates and ranked and notified whether they have received an overall combined passing score of seventy percent (70%). (Exh. L.)

**Response:** Admit.

35. From the list of those scoring seventy percent (70%) or more, Chief Searles is empowered to recommend any candidate to the Town Manager. (Exh. L; Searles Dep., pp. 105-06; Churchill Dep., pp. 37-38.)

**Response:** Deny that Defendant Searles is "empowered" to recommend "any" individual that receives a combined minimum score of 70%. The Chief may only recommend a candidates that is on a certified promotional list. Further, Police Department promotions are expressly intended to be consistent with Town's Personnel Rules and Regulations, which specifies that promotional lists be broken down into tiers. The three tiers are: Group A-Outstandingly Qualified, 90% or higher; Group B – Well Qualified, 80% to 89%; and, Group C - Qualified, 70% to 79%. Thus, the Town Rules and Regulations imply that candidates should be selected from higher tiers before resorting to lower rated candidates. (Plaintiff's Ex. 12 at Sec. 7-2 F)

12

PDF created with FinePrint pdfFactory Pro trial version http://www.pdffactory.com

36. In making this recommendation, the Chief examines the files of the candidates, speaks with their supervisors and other co-workers and arrives at his determination based on those inquiries and his independent knowledge of the candidate. (Searles Dep., p. 71.)

**Response:** Admit. Plaintiff adds, however, that in connection with his consideration of the candidates, the Police Chief's discretion is supposed to be exercised within the confines set forth in the Town's Personnel Rules regarding promotions and the Police Department's Regulations regarding promotions. Indeed, the Town's Personnel Policy states: "Appointments, promotions and other actions requiring the application of merit principles shall be based on systematic tests and evaluations; . . . Every employee has a moral obligation and is expected to comply with the spirit and intent of this merit system." (Plaintiff's Ex. 12 at Sec. 1)

37. In 1996, Officer Charles Bagley challenged the Department's decision not to promote him to Sergeant. (Board's written decision recounting the above attached as Exh. M.)

**Response:** Admit.

38. Out of five (5) candidates, Officer Bagley had the third-highest score on the initial three (3) components. (Exh. M.)

**Response:** Admit.

39. The two (2) candidates who scored higher than him, as well as the two (2) scoring lower than him, were promoted to Sergeant. (Exh. M.)

**Response:** Admit.

13

PDF created with FinePrint pdfFactory Pro trial version http://www.pdffactory.com

40. The matter was heard by the State Board of Mediation and Arbitration (the "Board"). (Exh. M.)

**Response:** Admit.


41. The Board held that the above-referenced Departmental Regulation governed the promotional process. (Exh. M.)

**Response:** Admit that the Board reached a decision. Plaintiff contends, however, the arbitration award cited by Defendants is not admissible evidence and is not binding on this Court.


42. It then examined whether the Chief was required to promote Officer Bagley based upon this Regulation. (Exh. M.)

**Response:** Admit that the Board reached a decision. Plaintiff contends, however, the arbitration award cited by Defendants is not admissible evidence and is not binding on this Court.


43. The Board held that the decision of which candidate may be chosen from the eligible list of those scoring over seventy percent (70%) "is solely within [the Chief's] discretion." (Exh. M.)

**Response:** Admit that the Board reached a decision. Plaintiff contends, however, the arbitration award cited by Defendants is not admissible evidence and is not binding on this Court.


44. In the spring of 1999, the Department learned of three (3) upcoming vacancies in the rank of Sergeant. (Pl. Dep. p. 34.)

**Response:** Admit.

PDF created with FinePrint pdfFactory Pro trial version http://www.pdffactory.com

45. After being evaluated by the outside consultant and the HR Department, four (4) candidates received scores of seventy percent (70%) or greater, and were placed on the promotional list. Officer Todd Spencer received the highest score (82.37). Officer Shannon Pollick, was second (78.01), the plaintiff was third (77.64), and Officer Tammy Medonis was fourth (73.29).(Email from Dede Moore, Human Resources Director, Exh. F from Searles Dep., attached as Exh. N; Searles Dep., p. 52.)

**Response:** Admit.


46. Of these possible candidates, Officers Spencer, a White male, Pollick, a White female, and Medonis, a White female, were promoted, while the plaintiff was not. (Pl. Dep., pp. 34-35.)

**Response:** Admit.


47. Officer Medonis was a better candidate because she had a more consistent performance history, lacked the plaintiff's record of "poor judgment," and had none of the "problems in relationships with people in the department" that the plaintiff did. (Searles Dep., p. 55.)

**Response:** Deny. Officer Medonis scored lower than Plaintiff on two of the three criteria used to arrive at the combined score relied upon in generating the promotional list. Although Plaintiff's judgment was questioned in some evaluations, it was lauded in more of them. Moreover, there was no reference to relationship problems in the department; indeed, his interaction with peers and supervisors alike was complimented. On the other hand, Officer Medonis was noted has having "a tendency to make excuses when being corrected on an issue." (Plaintiff's Exs. 1-3, 11)


48. Both of these problems reflected upon the plaintiff's leadership ability. (Searles Dep., p. 55.)

15

PDF created with FinePrint pdfFactory Pro trial version http://www.pdffactory.com

**Response:** Deny. While Plaintiff was corrected in connection with his judgment in certain specific incidents, he was regularly acknowledged as an exemplary leader in the department due to his attitude and initiative. (Plaintiff's Exs. 1-3, 5)

49. Chief Searles also knew that the plaintiff had problems directing new recruits in his capacity as Field Training Officer and had consequently been removed from that assignment. (Pl. Dep., p. 69; Searles Dep., p. 55.)

**Response:** Deny. Plaintiff had one problem in connection with a questionable search of a motor vehicle while serving as an FTO, which was later found to be appropriate by Captain Kearse. On the other hand, he was regularly complimented in connection with his attitude, initiative and willingness to assist others. (Def. Ex. J; Plaintiff's Exs. 1-3, 5)

50. This failing reflected upon the plaintiff's "suitability as a sergeant" because it involved "working with somebody, teaching them, supervising them, correcting them." (Searles Dep., p. 55.)

**Response:** Deny. Plaintiff was regularly complimented in connection with his attitude, initiative and willingness to assist others. (Def. Ex. J) Moreover, many of Plaintiff's reviews note that he should be considered for promotion to patrol supervision and/or as an instructor. (Plaintiff's Exs. 1-3, 5)

51. Additionally, the plaintiff also had inconsistent levels of activity while with the Department. (Searles Dep., p. 92; Continuation of Deposition of Chief Searles, October 8, 2004, p. 10 [hereinafter "Second Searles Dep., p._."], attached as Exh. O.).

16

PDF created with FinePrint pdfFactory Pro trial version http://www.pdffactory.com

**Response:** Deny. Plaintiff was regularly complimented in connection with his attitude, initiative and productivity. Indeed, his evaluations contain remarks like: "Ofc. Wininger continues to be one of the top performers in the area of self initiated activity;" and, "Russ has continued to perform as a department leader in the area of self initiated activity." (Def. Ex. J; Plaintiff's Exs. 1-3, 5) Further, the record of each of the officers promoted to Sergeant before Plaintiff reflected inconsistencies in performance, including low self initiated activity, poor judgment and/or insubordination. (Plaintiff's Exs. 8-10)

52. Mr. Churchill was aware of the plaintiff's history of "uneven performance" and "disciplinary actions." (Churchill Dep., pp. 18-19, 22, 24.)

**Response:** Deny. Aside from the rare incidents referred to by Defendants, Plaintiff's work record is exemplary. To the extent that there are any blemishes, they are similar or less severe than those exhibited by other Officers promoted to Sergeant instead of Plaintiff. (Def's Ex. J; Plaintiff's Ex. 1-3, 8-10)

53. As to the final decision, Mr. Churchill and Chief Searles discussed Chief Searles' recommendations and the candidates' skill sets with regard to "the command structure, ability to lead and command the respect of the rank and file…based upon those specific duties and those leadership demands." (Churchill Dep., pp. 37-38.)

**Response:** Admit. Plaintiff notes, however, that this approach deviates from both the Town's and Police Department's Personnel Policy, Procedures and Regulations. (Def's Ex. L; Plaintiff's Ex. 12)

17

PDF created with FinePrint pdfFactory Pro trial version http://www.pdffactory.com

54. Following this discussion, Mr. Churchill agreed with the Chief's judgment and accepted his recommendations. (Churchill Dep., pp. 37-38.)

**Response:** Admit that Defendant Churchill ratified Defendant Searles recommendation.

55. After the plaintiff learned he had not been promoted, he claims that he met with Chief Searles who told him that "Captain Triggs felt [his] decision making was lacking." (Pl. Dep., p. 35.)

**Response:** Admit. Plaintiff adds that Defendant Searles considered Plaintiff a "viable candidate" for promotion. (Pl. Dep., p. 35-36.) Moreover, Captain Kearse found Plaintiff's decision making appropriate and several other supervisors had noted that Plaintiff was suitable for promotion. (Plaintiff's Exs. 1-4)

56. The plaintiff testified that he had no reason to doubt that this was indeed the reason he was not being promoted. (Pl. Dep., p. 36.)

**Response:** Admit. Plaintiff also stated that he did not agree with it. (Pl. Dep., p. 36.)

57. The plaintiff never filed a grievance regarding his failure to be promoted. (Pl. Dep., p. 62.)

**Response:** Admit.

58. After the decision was made to promote Officers Spencer, Pollick and Medonis, Chief Searles installed those officers in order of their seniority, with Officer Spencer filling the first Sergeant vacancy, followed by Officer Medonis and then Officer Pollick. (Searles Dep., p. 60).

**Response:** Admit.

18

PDF created with FinePrint pdfFactory Pro trial version http://www.pdffactory.com

59. In the fall of 2000, one additional Sergeant vacancy was created. (Pl. Dep., p. 62.)

**Response:** Admit.

60. Six (6) officers received passing scores of seventy percent (70%) or greater for the 1999 promotion. Officer Philip Mikan received the highest score of 82.58, the plaintiff was next (80.64), William Freeman was fourth (77.55), Michele Neary, a White female, was fifth (76.88), and William Priester was sixth (71.50). (Email from Dede Moore, Human Resources Director, Exh. H from Searles Dep., attached as Exh. P; Searles Dep., p. 72.)

**Response:** Admit. Plaintiff adds that of those that received over 70% on their overall score, only he and Ofc. Mikan were placed in Group B – Well Qualified. No one qualified for Group A and all the other eligible candidates were in Group C - Qualified. (Def. Exh. P; Plaintiff's Ex. 12)

61. Chief Searles evaluated this list of candidates and recommended Officer Freeman, the third-ranking candidate, for promotion. (Searles Dep., pp. 72-73.)

**Response:** Admit.

62. Officer Freeman is a White male (Pl. Dep., p. 62),

**Response:** Admit.

63. Officer Freeman was promoted over two other White males who scored higher than him (i.e., Officer Mikan and the plaintiff). (Pl. Dep., pp. 62-63.)

**Response:** Admit.

19

64. Chief Searles believed that Officer Freeman best personified the attributes he was looking for: he had the strongest leadership skills of anyone on the list, as well as excellent patrol and policing skills. (Affidavit of Kevin Searles, "Searles Aff.," attached as Exh. Q.)

**Response:** Admit.

65. Chief Searles did not select the plaintiff because Officer Freeman was a superior candidate in these regards, and the plaintiff suffered from the judgment, relationship and supervision problems discussed above. (Searles Aff.)

**Response:** Deny. Plaintiff and Officer Freeman had very similar evaluation records, particularly with respect to compliments regarding their attitudes and initiative. Although Defendant Searles failed to recall that similarity, they were cited in the same commendation on more than one occasion. Likewise, Officer Freeman also received criticism of similar to that directed at Plaintiff. For instance, "Ofc. Freeman has shown some surprising decreases in performance areas (i.e. acceptance of feedback . . . ." and "sometimes in an eagerness to do the best job possible he makes mental mistakes. . . ." (Plaintiff's Ex. 10)

66. Again, as to the final decision, Mr. Churchill and Chief Searles discussed Chief Searles' recommendations and the candidates' skill sets with regard to "the command structure, ability to lead and command the respect of the rank and file…based upon those specific duties and those leadership demands." (Churchill Dep., pp. 37-38.)

**Response:** Admit. Plaintiff notes, however, that this approach deviates from both the Town's and Police Department's Personnel Policy, Procedures and Regulations. (Plaintiff's Ex. 12)

20

67. Following this discussion, Mr. Churchill agreed with the Chief's judgment and accepted his recommendations. (Churchill Dep., pp. 37-38.)

**Response:** Admit that Defendant Churchill ratified Defendant Searles recommendation.

68. The plaintiff never filed a grievance regarding his failure to be promoted in 2000. (Pl. Dep., p. 73.)

**Response:** Admit.

69. He did, however, discuss with Chief Searles some items of discipline in his file that he felt were unfair and should not have been considered in the promotion. (Pl. Dep., pp. 67-68.)

**Response:** Admit.

70. After this discussion, Chief Searles allowed the plaintiff to file grievances regarding some of the past discipline, even though he was well past the period specified under the CBA for doing so. (Pl. Dep., pp. 67-68.)

**Response:** Admit.

71. Chief Searles was not obligated to make this accommodation, and the plaintiff testified that the Chief was "fair" in this decision to do so. (Pl. Dep., pp. 68, 73.)

**Response:** Deny. Plaintiff testified that Defendant Searles was "trying to correct something that wasn't right to begin with." (Pl. Dep., pp. 68, 73.)

21

72. In his Complaint dated April 30, 2002 (the "Complaint"), the plaintiff alleges that the actions of the defendants in not promoting him unlawfully denied the plaintiff equal protection under the law and deprived him of liberty and property without due process. (Complaint, First, Second Counts.)

**Response:** Admit.

73. He finally alleges that the defendants intentionally inflicted emotional distress upon him. (Third Count.)

**Response:** Admit.

74. The plaintiff has sued the defendants both in their individual and official capacities. (Complaint, First Count, ¶ 2.)

**Response:** Admit.

75. The plaintiff has admitted that the Department has had a "long history" of individuals scoring well on promotional examinations, and being passed over for promotion. (Pl. Dep., pp. 83-84.)

**Response:** Admit.

76. The plaintiff admits that Officer Mikan, the top scoring candidate for the 2000 promotion, was also passed over for promotion; that is, he was treated the same as the plaintiff. (Pl. Dep., p. 63.)

**Response:** Admit.

77. The plaintiff has admitted that the defendants had no animosity toward him. (Pl. Dep. p. 74.)

22

PDF created with FinePrint pdfFactory Pro trial version http://www.pdffactory.com

**Response:** Deny. Plaintiff testified "I don't know one way or the other. I don't know if there is animosity." (Pl. Dep. p. 74.)

78. At his deposition, the plaintiff admitted that he was not denied any promotions based on his race. (Pl. Dep., pp. 55, 63.)

**Response:** Admit.

79. The plaintiff admitted that he was not denied the 2000 promotion based on his gender. (Pl. Dep., p. 63.)

**Response:** Admit.

80. Though the plaintiff stated in his deposition that female candidates had their seniority considered in the 1999 promotional process while he did not, he admits that "[t]he seniority issue came up after the promotions were made." (Pl. Dep., p. 57).

**Response:** Admit. Plaintiff, however, further explained that the dispute surrounding the 1999 promotional process was that the two top scoring candidates received an unfair advantage in connection with preparing for the exam. (Pl. Dep., p. 57).

81. Though seniority was not considered to determine who was promoted, it was considered for purposes of installing the new Sergeants in their positions, after they already had been selected for promotion. (Searles Dep., p. 60.)

**Response:** Admit.

23

PDF created with FinePrint pdfFactory Pro trial version http://www.pdffactory.com

82. Michele Neary, a female, scored fourth (4th) out of six (6) candidates on the 2000 promotional examination, and only slightly lower than the successful candidate. (Exhibit P.)

**Response:** Admit.

83. However, she was not promoted while a male was. (Pl. Dep., p. 62.)

**Response:** Admit.

84. The Town's charter specifically states that employees shall be hired only upon the basis of merit: "All officers and employees in the classified service of the town as described in section 5-12 of this charter shall be appointed on the basis of merit and in conformity with recognized principles of public personnel administration." (Charter § 5-2(b), copies of the relevant Charter provisions are attached as Exh. R.)

**Response:** Admit.

85. Policy-making authority with respect to Town personnel matters is reserved to the Town Council under the Charter. (Exhibit R.)

**Response:** Admit. The Town Charter also permits the Council to delegate certain personnel related duties and responsibilities to the Town Manager and other administrators. (Def. Ex. R.)

86. Charter Section 3-6 states: In addition to the powers herein enumerated the council shall have and exercise all powers heretofore conferred upon, possessed by or exercised by the governing body of the town under the Juris No. 26105 general law, and by duly called town meetings except where such powers are expressly reserved to town meetings by this act. (Exh. R.)

24

**Response:** Admit.

87. Town of Windsor Charter § 5-4(a) states: "There shall be a police department which shall be subject to such rules, regulations and penalties as the council may adopt and provide. The town manager shall appoint and promote the chief and other members of such department in consultation with the chief of police." (Exh. R.)

**Response:** Admit.

88. The plaintiff has admitted, under oath, that the defendants' conduct was, in fact, not "outrageous." (Pl. Dep., p. 76.)

**Response:** Admit.

89. He also does not claim that either defendant bears any animosity toward him. (Pl. Dep., p. 74.)

**Response:** Deny. Plaintiff testified "I don't know one way or the other. I don't know if there is animosity." (Pl. Dep. p. 74.)

90. He has called Mr. Churchill "cordial," and Chief Searles "fair." (Pl. Dep., pp. 73, 76).

**Response:** Admit. Plaintiff adds, however, that his reference to Defendant Searles was limited to the reduction of certain discipline reflected in Plaintiff's file. (Pl. Dep., pp. 73).

91. To date, the plaintiff has failed to submit a damage analysis. (Court Record.)

25

PDF created with FinePrint pdfFactory Pro trial version http://www.pdffactory.com

**Response:** Admit. Plaintiff notes, however, that both parties were represented by different counsel at the time the instant motion was filed. Defense counsel was replaced after certain attorney's changed firms. Plaintiff's prior counsel was subjected to professional discipline. After new counsel appeared for the parties, Plaintiff was permitted to pursue additional discovery, but the issue of a damage analysis was not raised.

**B.      Plaintiff's Statement of Material Facts in Dispute**

1.      Although final appointing and promoting authority is officially vested in the Town Manager, Defendant Searles admitted that as a practical matter he had final decision making authority with respect to the Windsor Police Department. (Plaintiff' Ex. 13, Searles dep. trans. at p. 64)

2.      In 1997, Plaintiff received twenty three "good job" performance reports. (Complaint at para. 6).

3.      Throughout 1997, Plaintiff's performance evaluations contained superior ratings in "Problem Solving/Decision Making". In addition to a multitude of other superior ratings and complimentary remarks, they repeatedly identify him as a candidate for promotion to Sergeant/patrol supervision. There is no indication that Defendants gave any consideration of these positive reflections of Plaintiff's performance. (Plaintiff's Ex. 1)

4.      In 1999, Plaintiff consistently received acceptable ratings in "Problem Solving/Decision Making", in addition to a multitude of superior ratings and complimentary remarks. There is no indication that Defendants gave any consideration of these positive reflections of Plaintiff's performance. (Plaintiff's Ex. 2)

PDF created with FinePrint pdfFactory Pro trial version http://www.pdffactory.com

5.      In 2000, Plaintiff was again rated superior in "Problem Solving/Decision Making". In addition to a multitude of other superior ratings and complimentary remarks, his evaluation expressly identifies him as a candidate for promotion to Sergeant. There is no indication that Defendants gave any consideration of these positive reflections of Plaintiff's performance. (Plaintiff's Ex. 3)

6.      Before his promotion to Sergeant, Officer James Bernard received a written reprimand for the accidental discharge of a shotgun in the department's armory, which "could have easily lead to the loss of [his] life or the life of a fellow officer." This manifestly poor judgment did not prevent his promotion. Indeed, there is no indication that Defendants gave any indication to this behavior before promoting him. (Plaintiff's Ex. 8)

7.      Before his promotion to Sergeant, Officer James Bernard received a written reprimand for damaging his cruiser and deliberately failing to report that damage to his supervisor. This manifestly poor judgment did not prevent his promotion. Indeed, there is no indication that Defendants gave any indication to this behavior before promoting him. (Plaintiff's Ex. 8)

8.      Before his promotion to Sergeant, Officer Francis received a written reprimand for insubordination. This manifestly poor judgment did not prevent his promotion. Indeed, there is no indication that Defendants gave any indication to this behavior before promoting him. (Plaintiff's Ex. 9)

9.      Before her promotion to Sergeant, Officer Medonis' performance evaluation reflected that she made excuses when presented with supervisory correction. This documented behavior flaw did not prevent her promotion. Indeed, there is no indication that Defendants gave any indication to this behavior before promoting her.  (Plaintiff's Ex. 11)

27

PDF created with FinePrint pdfFactory Pro trial version http://www.pdffactory.com

10.     Before his promotion to Sergeant, Officer Freeman received a performance evaluation in 1997 that stated: "Sometimes in eagerness to do the best job possible he makes mental mistakes . . . ." This documented poor judgment did not prevent his promotion. Indeed, there is no indication that Defendants gave any indication to this behavior before promoting him. (Plaintiff's Ex. 10)

11.     Before his promotion to Sergeant, Officer Freeman received a performance evaluation in 1998 that he displayed "surprising decreases in performance areas . . . .). This manifestly poor performance did not prevent his promotion. Indeed, there is no indication that Defendants gave any indication to this behavior before promoting him.  (Plaintiff's Ex. 10)

12.     Plaintiff appears in multiple positive performance observations along with Officer Freeman. While it appears these observations were used to support Defendants' decision to promote Officer Freemen, there is no indication that Plaintiff received similar consideration. (Plaintiff's Ex. 7)

13.     Before his promotion to Sergeant, Officer Freeman was afforded a personal interview with Defendant Searles. This interview was not in accordance with the standard promotional process. Plaintiff was not afforded the same type of interview opportunity. (Plaintiff' Ex. 13, Searles dep. trans. at p. 73).

14.     As a matter of regular practice, Defendant Searles deviated from the promotion process set forth in the Town's and Department's Policies, Procedures and Regulations. (Plaintiff' Ex. 13, Searles dep. trans. at pp. 64-65).

15.     Several ranking officers of the Windsor Police Department have been arrested for criminal conduct including drunk driving, larceny, and *inter alia* domestic violence. Some of those ranking officers have left the department and some have been demoted. On the other hand,

28

PDF created with FinePrint pdfFactory Pro trial version http://www.pdffactory.com

some retained their positions without consequence. For instance, the same Captain Triggs that

questioned Plaintiff's judgment was suspended for getting in a drunk driving accident. Likewise,

Sergeant McKee was arrested for drunk driving and suffered no adverse consequences. Further,

the same Sergeant LePore that questioned Plaintiff's judgment was embroiled in problems

involving inappropriate comments to a female member of the department and firing his weapon

at an automobile. Despite these self-evidently serious deficiencies in judgment, they continue to

hold supervisory positions. (Plaintiff' Ex. 13, Searles dep. trans. at pp. 93-92).

      16.    Plaintiff has been singled out for adverse treatment compared to similarly situated

members of the Windsor Police Department. (Plaintiff's Exs. 1-13).

      17.    Plaintiff has been denied due process as a result of Defendants deviation from the

Town's and Department's Policies, Procedures and Regulations pertaining to promotions.

(Plaintiff's Exs. 1-13).


      WHEREFORE Defendants' motion for summary judgment should be denied in view of

the numerous issues of disputed material fact.


                         Respectfully submitted,
                         The Plaintiff, Russell L. Wininger, Jr.


          By:   _____
                         Craig T. Dickinson
                         Fed. Bar No.: ct18053
                         Madsen, Prestley & Parenteau, LLC
                         44 Capitol Avenue - Second Floor East
                         Hartford, CT 06106
                         (860) 246-2466
                         Attorneys for the Plaintiff

PDF created with FinePrint pdfFactory Pro trial version http://www.pdffactory.com

## **CERTIFICATION OF SERVICE**

This is to certify that a copy of the foregoing was sent via first class mail on this 21st day of July 2006, to the following counsel of record:

James A. Mongillo
Baio & Associates
15 Elm Street
Rocky Hill, CT 06067


_____
Craig T. Dickinson

PDF created with FinePrint pdfFactory Pro trial version http://www.pdffactory.com