Slip Copy, 2006 WL 2246372 (D.Conn.)

Only the Westlaw citation is currently available.
United States District Court,
D. Connecticut.
Peter SWEENEY, Plaintiff,
v.
William LEONE, Daniel J. McIntyre, and the City of Bristol, Defendants.
Civil No. 3:05cv871 (PCD).
July 31, 2006.

John R. Williams, New Haven, CT, for Plaintiff.
Joseph W. McQuade, Kainen, Escalera & McHale, PC, Hartford, CT, for Defendants.

## RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

PETER C. DORSEY, District Judge.
*1 Plaintiff brings this action pursuant to 42 U.S.C. § 1983, alleging violations of his First and Fourteenth Amendment rights. Defendants William Leone, Daniel McIntyre, and the City of Bristol (collectively, the "Defendants") move for summary judgment on all claims. For the reasons set forth herein, Defendants' Motion for Summary Judgment [Doc. No. 25] is **granted.**

### I. BACKGROUND[FN1]

> FN1. The statement of facts that follows is derived from the parties' Local Rule 56 Statements. Only those facts necessary to the resolution of this Motion for Summary Judgment will be discussed here.

The City of Bristol ("City") is a municipality located in the state of Connecticut. (Pl.'s Rule 56(a)(2) Statement at ¶ 1.) At all times relevant to Plaintiff's Complaint, Defendant Daniel McIntyre ("McIntyre") was a Captain in the Bristol Police Department, and Defendant William Leone ("Leone") was a Lieutenant in the Bristol Police Department. ( Id. at ¶¶ 2-3.) Since September 2003 and at all times relevant to this complaint, Plaintiff Peter Sweeney has been employed by the City of Bristol as a dispatcher working within the Communications division of the Bristol Police Department. ( Id. at ¶ 4). Plaintiff is also a licensed Emergency Medical Technician ("EMT") and he received a state telecommunicator's certificate after he began working for the City. ( Id. at ¶ 5.) In addition to his dispatch duties, Plaintiff has provided quality assurance/quality instruction for the Communications department and is responsible for reviewing 911 calls for quality assurance and instruction purposes. ( Id. at ¶ 7.) Plaintiff is the only person in the department responsible for this. ( Id.)
The City made a decision to consolidate dispatch operations for police, fire, and emergency medical dispatch into one dispatch center in 2004. ( Id. at ¶ 9.) On or around December 1, 2004, the centralized dispatch operations became effective.[FN2] ( Id. at ¶ 10.)

> FN2. The Court notes that Plaintiff allegedly voiced concerns about increased workload and staffing levels in the dispatch center to his union, Lieutenant Estes (the lieutenant in charge of Communications), Diane Ferguson (Assistant Director of Personnel), and the Salary Committee of the City Council prior to the consolidation. He cannot recall when he spoke with these people or what exactly he said, but generally he "was vocal about fire coming into dispatch without any additional personnel. I had stated my opinion." (Sweeney Dep. at 62:12-66:6, Nov. 29, 2005.) Plaintiff's Opposition ("Pl.'s Opp."), however, claims that this speech is not the "operative" speech in the case at bar and therefore the Court need not consider it in the motion for summary judgment.

On the morning of December 2, 2004, Plaintiff started his shift at 7:00 a.m. ( Id. at ¶ 11.) Plaintiff

was working in dispatch along with dispatchers Sean Mowad and Robert Mosback. (*Id.*) Fireman Robert Gokey was also present in the Communications Center that morning. (*Id.*) Fireman Gokey was not a dispatcher, but he was available to answer questions. (*Id.*) According to Plaintiff, the dispatch center received an increased number of calls on December 2 due to heavy winds. (*Id.* at ¶ 12.) Plaintiff does not recall any large scale fire on that day, but he does recall that a tree fell on a house or a car. (*Id.*) [FN3] Plaintiff also remembers that one 911 call went completely unanswered. (*Id.* at ¶ 13.) The call was returned as soon as the next dispatcher was available, according to protocol. (*Id.*)

> FN3. Plaintiff denies that there was no large scale fire in paragraph 12 of his Rule 56(a)(2) Statement. This is not an effective denial because the supporting citation to the record, Plaintiff's Interrogatory Response at paragraph 2, does not deny the absence of large-scale fires that day, and it does not deny any other assertions contained in paragraph 12 of Defendants' Rule 56(a)(1) Statement.

Chief of Police John DiVenere ("DiVenere") sent an email on November 29, 2004, stating that in an emergency at the dispatch center, the officer in charge may pull an officer certified to do dispatch services from other duties, and assign that officer to help in the Communications Center.[FN4] (*Id.* at ¶ 14.) When the call volume became higher than normal on December 2, Plaintiff contacted Defendant Leone, the officer in charge at the time, to request additional support in the dispatch center. (*Id.* at ¶ 16.) Defendant Leone denied Plaintiff's request. Plaintiff then contacted Defendant McIntyre, the next highest in command, and asked for assistance. (*Id.* at ¶ 16-17.)

> FN4. The email reads in its entirety: "The OIC [Officer In Command] has a list in his office of officers who are certified to work dispatch duties. [I]n an emergency the OIC may, and is encouraged, to pull a certified officer off the road and assign them to assist in Commo [Communications] until the emergency is complete, but for no longer than 4 hrs, per our contract. This should satisfy the needs of commo for staff in high traffic times, such as fires, large accidents, etc. The OIC should take advantage of this to assist in commo as needed." (Ex. 3 to Sweeney Dep.)

**\*2** Defendant McIntyre came to the dispatch center and monitored the situation for a few minutes. (*Id.* at ¶ 18.) The amount of incoming calls during his visit seemed to be lower than before, but the dispatch center remained busy for the rest of the day. (*Id.* at ¶¶ 19-20.) Defendant McIntyre did not take further action and he did not assign an officer to assist in the Communications center. (Response to Interrog. No. 4, Ex. 2 to Sweeney Dep.)
Shortly after leaving the dispatch center, Defendant McIntyre saw Defendant Leone in the hallway. (*See* McIntyre Aff. at ¶¶ 11-12, Ex. H to Defs.' Rule 56(a)(1) Statement; *see also* Britt Report at SWEENEY 000034, Ex. 5 to Sweeney Dep.) Defendant McIntyre testified that he wanted to give Defendant Leone minor criticism on how to handle the dispatchers' requests for help. (*Id.*) He sought to give such criticism in private and made sure that the hallway was empty of people before doing so. (*Id.*) He instructed Defendant Leone that in the future, when dispatchers requested an officer be pulled off of the road and assigned to Communications, Defendant Leone should personally visit the dispatch center and observe the level of activity. (*See* Leone Aff. at ¶¶ 8-9, Ex. I to Defs.' Rule 56(a)(1) Statement; *see also* Britt Report at SWEENEY 000033.)
From the dispatch center, Plaintiff observed Defendant McIntyre and Defendant Leone conversing in the hallway on the monitors. (Pl.'s Rule 56(a)(2) Statement at ¶ 21.) Plaintiff observed Defendant Leone gesturing in a "hostile manner" and thought he was pointing his hands toward the dispatch center. (*Id.* at ¶ 23.) Plaintiff interpreted Defendant Leone's gestures to be indicative of anger but he did not know with whom Defendant Leone might have been angry. (*Id.*) From his console in the dispatch center, Plaintiff had access to various intercoms throughout the police building. (*Id.* at ¶ 25.) According to Plaintiff, dispatchers would use the intercom system to monitor booking and during prisoner processing, in case the officers asked for something on the cameras, or when someone "comes to the door or presses any one of the call boxes." (Sweeney Dep. at 55:20-56:2.)
Plaintiff accessed the intercom in the hallway near where Defendants McIntyre and Leone were conversing and listened in on the conversation for approximately seven to fifteen seconds. (Pl.'s Rule

56(a)(2) Statement at ¶¶ 27, 31.) Plaintiff listened in on the conversation because he thought Defendant Leone was saying something "that had to do with dispatch." ( *Id.* at ¶ 28.) Plaintiff had no intention of saying anything to the officers when he accessed the intercom system, and he did not feel that anyone was in danger. ( *Id.* at ¶ 30.)

As Defendant Leone testifies in his affidavit, he told Defendant McIntyre that "if the dispatchers are so busy with the added fire duties, then maybe it is not a good idea to be watching television and/or D.V.D. players." ( *See* Leone Aff. at ¶¶ 8-9; *see also* Britt Report at SWEENEY 000033.) [FN5] Defendant Leone further stated to Defendant McIntyre, "I often see this practice being conducted by communication personnel, especially on the weekends. In my opinion, given the added fire duties it was probably not a good idea to allow this action to continue in the future." ( *Id.*) [FN6] Defendant McIntyre admitted that these concerns might be valid and said he would look into them. ( *Id.*) Plaintiff was upset that Defendant McIntyre did not defend the dispatchers. (Pl.'s Rule 56(a)(2) Statement at ¶ 32.) These comments are the only portion of the conversation that Plaintiff overheard using the intercom system, and he admits that neither Defendant McIntyre nor Defendant Leone consented to his listening in on their conversation. ( *Id.* at ¶ 31, 35.) [FN7]

> FN5. Plaintiff contends that this factual assertion, found in paragraph 22 of Defendants' 56(a)(1) Statement, is inadmissible as hearsay and should be stricken from the record. Plaintiff also contends that paragraphs 32, 40, 41, 45, 46, 48, 49, 50, 51, 52, and 53 are similarly inadmissible and should be stricken. ( *See* Pl.'s Mem. Opp. Summ. J at 3 n. 1.) However, in their Reply, Defendants offer additional affidavits to support these disputed factual assertions from Defendant Leone, Defendant McIntyre, Chief of Police DiVenere, and Diane Ferguson, the Acting Director of Personnel for the City of Bristol. ( *See* Defs.' Reply at 4-5; *see also* Exhs. F-I to Defs.' Rule 56(a)(1) Statement.) These additional affidavits adequately support the factual assertions in paragraphs 22, 32, 40, 41, 48, 51, 52, and 53 of Defendants' Rule 56(a) Statement, and accordingly, the Court will not strike them from the record.
>
> The statements in paragraphs 45, 46, 49, and 50 of Defs.' Rule 56(a)(1) Statement contain assertions related to Captain Britt's investigation of the incidents on December 2, 2004, and Defendants have provided affidavits authenticating this report. The investigative report is not admissible for the truth of its contents, however, it is admissible to illustrate the motivation of Ferguson and the City in deciding to impose the two-day suspension upon Plaintiff, and the basis on which that decision was made. *See Zubrow v. Solvay Pharms.*, No. 03cv1929 (WWE), 2006 U.S. Dist. LEXIS 7039, at *19 (D.Conn. Feb. 3, 2006) ("The Court finds that the statements and exhibits sought to be stricken do not constitute hearsay since they are not offered to prove that the statements contained therein are true, but are indicative of the motivation for the decision to terminate plaintiff's employment."). Accordingly, the statements in paragraphs 45, 46, 49, and 50 of Defs.' Rule 56(a)(1) Statement are deemed admitted for that limited purpose.
>
> FN6. Plaintiff contends that Defendant Leone swore when referring to the dispatchers, and asserts that he found Leone's remarks hostile and accusatory in nature and tone. There is, however, no dispute about the content of Defendant Leone's remarks; the exact words used are irrelevant to the issues at stake in this case.
>
> FN7. Plaintiff denies that this conversation was private, as it was conducted in a public hallway (an area where, Plaintiff claims, the Defendants knew electronic monitoring could be used). Plaintiff admitted in his deposition, however, that no one instructed him that: (a) he was authorized to listen in on conversations or (b) there would be times when he would need to monitor conversations within the police department by using the intercom system. (Sweeney Dep. at 61:21-62:4.) Plaintiff maintains that he had not been instructed on specific cameras to monitor or not monitor, and that dispatchers generally used their own judgment in choosing what to monitor. ( *Id.* at 125:16-22.)

**\*3** After the conversation between Defendants McIntyre and Leone ended, Plaintiff accessed an intercom as Defendant McIntyre approached the dispatch center and asked him to step inside. ( *Id.* at ¶ 37.) Plaintiff admits that he did so to "confront him about what I had just observed and heard on the intercom system." (Sweeney Dep. at 43:14-15, Ex. A to Defs.' Rule 56(a)(1) Statement.) Plaintiff was angry and raised his voice, telling Defendant McIntyre that "there are ears all over this place, and that someone could have overheard those comments. I asked how he could, as a captain, let Lt. Leone talk that way about dispatch." ( *Id.* at 43:20-24.) Defendant McIntyre had little to say about Plaintiff's concerns, and the conversation took about ten minutes. (Pl.'s Rule 56(a)(2) Statement at ¶ 39.)

When asked in his deposition to identify other dispatchers who had used the intercom system in the same manner as Plaintiff did, he responded that he was "not going to name others who have pushed the button to listen to a conversation." (Sweeney Dep. at 116:17-18.) Plaintiff stated that he is aware of other instances where other dispatchers and officers used the intercom system to listen in on conversations between officers, however, he cannot "name any one person or a specific time and incident," stating only that he has heard of it and other employees have told him that it has occurred. ( *Id.* at 116:19-117:19.) None of the other dispatchers have admitted to Plaintiff that they have listened in on conversations between officers. ( *Id.* at 117:20-118:12.)

Defendant McIntyre testified that he was "stunned" by Plaintiff's admission that he listened in on his conversation, and he later reviewed the eavesdropping statute in Connecticut. (McIntyre Aff. at ¶¶ 5-6.) He believed that Plaintiff had committed a felony when he used the intercom system to listen in on a private conversation. ( *Id.* at ¶ 6.) He consulted with Supervisory Assistant State Attorney Stephen Preleski, who advised Defendant McIntyre that the eavesdropping statute applied to the situation. (Id. at ¶ 7.) Defendant McIntyre requested that the department conduct a criminal investigation into the matter, but his request was denied. ( *Id.* at ¶¶ 8-9.) Defendant McIntyre also informed Defendant Leone that Plaintiff had overheard their conversation, and Defendant Leone then requested a criminal investigation. (Leone Aff. at ¶¶ 3, 5.) Chief DiVenere decided not to pursue an arrest warrant application against Plaintiff based on the advice of Attorney Preleski, and he instead assigned Captain Daniel Britt ("Britt") to conduct an internal investigation of the complaint. (DiVenere Aff. at ¶¶ 7, Ex. C to Defs.' Rule 56(a)(1) Statement.)

As part of the internal investigation, Plaintiff was called to Britt's office for an investigatory interview. (Pl.'s Rule 56(a)(2) Statement at ¶ 44.) After conducting various interviews and reviewing documents, Britt produced an investigative report of the incident which concluded that Plaintiff had violated City Work Rule Number 2 <u>FN8</u> and Work Rule Number 8.<u>FN9</u> (Britt Report.) Britt recommended that Plaintiff be subject to a personnel hearing, but did not recommend any particular discipline. ( *Id.*)

> FN8. Work Rule Number 2 is violated when a City employee engages in, *inter alia,* "misappropriation of City property." (Ferguson Aff. ¶ 6.) Britt's report concludes that Plaintiff violated the Work Rule because he "used the electronic monitors improperly and dishonestly." (Britt Report.)

> FN9. Work Rule Number 8 is violated when an employee engages in "[i]mmoral or indecent conduct." (Ferguson Aff. ¶ 6.)

**\*4** Diane Ferguson, the Acting Director of Personnel at the time, received Britt's investigative report. (Ferguson Aff. at ¶¶ 2-3, Ex. F to Defs.' Rule 56(a)(1) Statement.) On February 9, 2005, based on the report, she sent a letter to Plaintiff informing him of a pre-disciplinary conference in connection with the allegations and recommendations contained in Britt's report. ( *Id.* at ¶ 4.) Specifically, she informed Plaintiff that he was charged with violating City Work Rules 2 and 8 as a result of his alleged conduct. ( *Id.*) The hearing took place on February 15, 2005, and on February 23, 2005, an Employee Reprimand Report was issued, stating that Plaintiff would receive a two-day suspension without pay for violation of City Work Rules 2 and 8. ( *Id.* at ¶ 8; Pl.'s Rule 56(a)(2) Statement at ¶ 52.) Plaintiff filed a grievance with his union over the two-day suspension, however, the parties reached a settlement agreement prior to the commencement of arbitration. (Pl.'s Rule 56(a)(2) Statement at ¶¶ 54-55.)

Plaintiff claims that after the events of December 2, 2004, Defendant McIntyre encouraged a citizen, Amy Talit, to make a sexual harassment complaint regarding Plaintiff. ( *Id.* at ¶ 62.) Plaintiff acknowledges having a conversation with Ms. Talit both by telephone and in person. ( *Id.*) Ms. Talit

claimed that Plaintiff said some inappropriate things, which he denies. (*Id.*) Plaintiff concedes that Defendant McIntyre did not encourage Ms. Talit to file a *false* complaint, and Plaintiff was not disciplined as a result of the complaint. (*Id.*)

Plaintiff also claims that after the events of December 2, 2004, Lieutenant Estes notified him that another dispatcher would perform Plaintiff's quality assurance work. (Sweeney Dep. at 80:9-12.) The proposed replacement also possessed the qualifications necessary to perform the quality assurance work, and the reason given for this change was to see if there would be any difference in scores. (*Id*. at 80:13-24.) Before the change actually occurred, however, Plaintiff received another email stating that the Chief of Police decided to allow Plaintiff to continue to do the quality assurance work. (Pl.'s Rule 56(a)(2) Statement at ¶ 64.) Plaintiff never lost quality assurance responsibilities and he never lost any pay or overtime associated with the quality assurance work as a result of these events. (*Id.*)

This lawsuit was initiated on June 2, 2005, when Plaintiff filed the Complaint against Defendants, alleging, pursuant to 42 U.S.C. § 1983, that they violated his First Amendment and Fourteenth Amendment rights. Defendants filed papers in support of their Motion for Summary Judgment on April 3, 2006.

## II. DISCUSSION

### A. Standard for Summary Judgment

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). No genuine issue of material fact exists and summary judgment is therefore appropriate when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A material fact is one which "might affect the outcome of the suit under the governing law" and an issue is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct 2505, 91 L.Ed.2d 202 (1986). Importantly, however, "[c]onclusory allegations will not suffice to create a genuine issue." *Delaware & H.R. Co. v. Conrail,* 902 F.2d 174, 178 (2d Cir.1990).

**\*5** The moving party bears the burden of establishing that summary judgment is appropriate, *Anderson,* 477 U.S. at 255, however, when moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant can satisfy its burden of establishing that there is no genuine issue of material fact in dispute by pointing to an absence of evidence to support an essential element of the non-moving party's claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial. It need only point to an absence of proof on plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.' " *Parker v. Sony Pictures Entm't,* Inc., 260 F.3d 100, 111 (2d Cir.2001) (quoting *Celotex,* 477 U.S. at 324); *see also Gallo v. Prudential Residential Servs. Ltd. P'ship,* 22 F.3d 1219, 1223-24 (2d Cir.1994) ("The moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case.").

The non-moving party, in order to defeat summary judgment, must then come forward with "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson,* 477 U.S. at 249. In making this determination, the Court draws "all factual inferences in favor of the party against whom summary judgment is sought, viewing the factual assertions in materials such as affidavits, exhibits, and depositions in the light most favorable to the party opposing the motion." *Rodriguez v. City of N.Y.,* 72 F.3d 1051, 1060 (2d Cir.1995) (citations omitted). However, a party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading." Fed.R.Civ.P. 56(e).

Determinations of the weight to accord evidence or assessments of the credibility of witnesses are improper on a motion for summary judgment as such are within the sole province of the jury. *Hayes v. N.Y. City Dep't of Corr.,* 84 F.3d 614, 619 (2d Cir.1996). "If reasonable minds could differ as to the import of the evidence ··· and if ··· there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot

obtain a summary judgment." *R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 59 (2d Cir.1997) (internal citations omitted); *see also Matsushita,* 475 U.S. at 586 ("some metaphysical doubt as to the material facts" is insufficient for summary judgment); *Sologub v. City of New York,* 202 F.3d 175, 178 (2d Cir.2000) ("When reasonable persons applying the proper legal standards could differ in their responses to the questions raised on the basis of the evidence presented, the question is best left to the jury.").

### B. First Amendment Claim

**\*6** Plaintiff filed suit under 42 U.S.C. § 1983, claiming that as a result of his speech directed at Defendants McIntyre and Leone on December 2, 2004, he received a two-day suspension from work without pay. Plaintiff argues that any disciplinary action premised on this speech violated his First Amendment right to free speech. (Compl.¶ 20.) Defendants argue that Plaintiff's First Amendment claims lack merit because he cannot demonstrate that he uttered any protected speech upon a matter of public concern. (Defs.' Mem. Supp. Mot. Summ. J. at 6-9.) Defendants also argue that even if the speech at issue is protected, Plaintiff cannot demonstrate that this speech was a substantial or motivating factor in his two-day suspension. ( *Id.* at 9-11.)

It is important to articulate exactly what speech is at issue in this case. In his opposition to the motion for summary judgment, Plaintiff limits the inquiry, explaining that "the operative complaints are those directed to defendants Leone and McIntyre on the morning of December 2, 2004." (Pl.'s Mem. Opp. Summ. J. at 7.) Plaintiff asserts that three incidents constitute the protected speech at issue here: (1) Plaintiff's request to Defendant Leone for help in the dispatch center, (2) Plaintiff's subsequent request to Defendant McIntyre for help, and (3) Plaintiff's confrontation with Defendant McIntyre after he overheard the conversation between Defendants McIntyre and Leone in the hallway. Therefore, this Court's holding on the First Amendment claim is limited to these three incidents.

#### 1. *Standard for Government Employees' First Amendment Claims*

Government employees have a limited right under the First Amendment to speak as a citizen on matters of public concern. *Sheppard v. Beerman,* 317 F.3d 351, 355 (2d Cir.2003) (citing *Connick v. Myers,* 461 U.S. 138, 140, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Frank v. Relin,* 1 F.3d 1317, 1328 (2d Cir.1993)). To make out a *prima facie* case that he was disciplined in violation of his First Amendment rights, Plaintiff must demonstrate that: "(1) his speech can be fairly characterized as constituting speech on a matter of public concern, and (2) the speech was at least a substantial or motivating factor in the [discipline]." *Sheppard,* 317 F.3d at 355 (internal quotations and citation omitted).

Even if an employee makes out a *prima facie* case, however, "[a] government official may nonetheless fire an employee for speaking on a matter of public concern if the employee's speech is reasonably likely to disrupt the effective functioning of the office, and the employee is fired to prevent this disruption." *Id.* (internal quotation and citation omitted). Courts apply a balancing test to determine whether the potential for disruptiveness in the workplace outweighs an employee's First Amendment rights. *See, e.g., Connick,* 461 U.S. at 150-53; *Knight v. Conn. Dep't of Pub. Health,* 275 F.3d 156, 164-65 (2d Cir.2001); *Lewis v. Cowen,* 165 F.3d 154, 161 (2d Cir.1999) ("This weighing, commonly referred to as the *Pickering* balancing test, is necessitated by the State's dual role as employer and sovereign."). In conducting this balancing test, courts should weigh the "interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Sheppard,* 317 F.3d at 355 (quoting *Pickering v. Bd. of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)). Even if the court finds that the competing interests favor the government/employer, a First Amendment plaintiff can establish liability "by proving that the employer disciplined the employee in retaliation for the speech, rather than out of fear of the disruption." *Lewis,* 165 F.3d at 163.

**\*7** Whether the speech can be classified as speech addressing a matter of public concern is a question of law for the Court, "taking into account the content, form, and context of a given statement as revealed by the whole record." *Lewis,* 165 F.3d at 163 (citations omitted). In making this determination, "the court should focus on the motive of the speaker and attempt to determine whether the speech was calculated to redress personal grievances or whether it had a broader public purpose." *Id.* at 163-64.

### 2. *Plaintiff's Speech was Not a Matter of Public Concern*

Defendants argue, as an initial matter, that Plaintiff cannot make out a *prima facie* case because his speech to Defendant McIntyre regarding the contents of the conversation between Defendants McIntyre and Leone was not a matter of public concern. (Defs.' Mem. Supp. Mot. Summ. J. at 6-9.) If this speech "cannot be fairly characterized as constituting speech on a matter of public concern, it is unnecessary for [the Court] to scrutinize the reasons for [the] discharge." *Connick*, 461 U.S. at 146. Speech regarding a "purely private matter, such as an employee's dissatisfaction with the conditions of his employment, does not pertain to a matter of public concern." *Lewis*, 165 F.3d at 164; *Connick*, 461 U.S. at 147.[FN10]

> FN10. The motivating factor behind Plaintiff's suspension is disputed, but it is unnecessary to resolve the issue because the Court finds herein that Plaintiff cannot make out the first element of his *prima facie* case: that he spoke out as a citizen on a matter of public concern. Therefore, it is assumed, for the purposes of Plaintiff's First Amendment claim, that his speech (and not the eavesdropping or confrontation with Defendant McIntyre) provoked the suspension.

As the record demonstrates, Plaintiff's confrontation with Defendant McIntyre after overhearing the conversation in the hallway did not constitute speech on a matter of public concern. It is uncontested that after listening to the conversation between Defendants McIntyre and Leone, Plaintiff called Defendant McIntyre into the dispatch center to confront him about what he had seen and heard on the intercom system. (Pl.'s Rule 56(a)(2) Statement at ¶ 37.) Specifically, Plaintiff took issue with Defendant Leone's accusations regarding the dispatchers' work habits. Plaintiff's speech to Defendant McIntyre was that "there are ears all over this place, and ··· someone could have overheard those comments [about the dispatchers]. I asked how he could, as a captain, let Lt. Leone talk that way about dispatch." (Sweeney Dep. at 43:20-44:1.)

Plaintiff did not bring up his frustration or concerns regarding the consolidation of dispatch services during this conversation, comments that could arguably be considered matters of public concern.[FN11] Rather, he aired personal grievances about the treatment of dispatchers by Defendant Leone and other officers. His speech was not calculated to address a broader public purpose, and it was not offered as a complaint about under-staffing in the dispatch center. Plaintiff's admitted motive was to confront Defendant McIntyre about what he had seen and heard on the intercom system. (Pl.'s Rule 56(a)(2) Statement at ¶ 37.) The conversation between Defendants McIntyre and Leone pertained to the dispatchers' work habits and Defendant McIntyre's failure to defend the dispatchers. (*See id.* at ¶¶ 37-39.)

> FN11. The fact that Plaintiff's statements were addressed to a private party and were not "public" does not change the analysis of the nature of the allegedly protected speech. *See Rankin v. McPherson*, 483 U.S. 378, 387 n. 11, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987).

*8 Plaintiff's statements only concerned a perceived lack of respect for dispatchers. The fact that the employees at issue here are responsible for the safety of the public does not make the grievance a matter of public concern. *See McGee v. Green*, 425 F.Supp.2d 249, 256 (D.Conn.2006) ("McGee's complaints are not significant to the public simply because she works for an organization with a sensitive public mission."). As the Supreme Court has noted:

To presume that all matters which transpire within a government office are of public concern would mean that virtually every remark-and certainly every criticism directed at a public official-would plant the seed of a constitutional case. While as a matter of good judgment, public officials should be receptive to constructive criticism offered by their employees, the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs. *Connick*, 461 U.S. at 149.

### 3. *Plaintiff's Speech was Made Pursuant to Official Duties*

The remaining two incidents upon which Plaintiff bases his First Amendment claims are (1) Plaintiff's initial call to Defendant Leone requesting extra assistance in the dispatch center and (2) Plaintiff's subsequent call to Defendant McIntyre requesting help. The Court finds, based on the rule articulated by the Supreme Court in *Garcetti v. Ceballos,* 547 U.S. ----, 126 S.Ct. 1951, 164 L.Ed.2d 689, 2006 U.S. LEXIS 4341 (2006), that Plaintiff's two calls to request help in the overloaded dispatch center are not protected by the First Amendment because they were made pursuant to his official duties as dispatch supervisor of the shift.

The Supreme Court recently held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Id.* at *21. In *Garcetti,* the plaintiff, a deputy district attorney, expressed his views in a memorandum to his supervisor and recommended dismissal of a case. Since the plaintiff "spoke as a prosecutor fulfilling a responsibility to advise his supervisor about how best to proceed with a pending case," his speech was not protected against discipline under the First Amendment. *Id.* The Court reasoned that the plaintiff did not act as a citizen when he performed his "daily professional activities" and "[t]he fact that his duties sometimes required him to speak or write does not mean his supervisors were prohibited from evaluating his performance." *Id.* at *22.

The Seventh Circuit's recent application of *Garcetti* is instructive in the case at bar. In *Mills v. City of Evansville, Ind.,* No. 05-3207, 2006 U.S.App. LEXIS 15082 (7th Cir. June 20, 2006), the plaintiff brought claims similar to those at issue here, for violation of her First Amendment free speech rights. Mills, a police sergeant in Evansville, Indiana, had responsibilities that included supervising crime prevention officers, or CPOs. The police department held a meeting to discuss proposals for coping with a manpower shortage, and one such proposal was to reduce the number of CPOs under Mills' supervision. Mills told senior managers after the meeting that the plan would not work, community organizations would not support the change, and they would eventually have to restore the original personnel assignments. Those present believed that Mills would try to influence the community to reject the plan, rather than describe its virtues. Mills was then reassigned, she lost supervisory responsibilities and the personal use of a departmental car, and the police captain put a "Summary of Counseling" in her personnel file. *Id.* at * 1-3.

*9 Since Mills spoke out against the policy "in her capacity as a public employee contributing to the formation and execution of official policy," the Seventh Circuit held that her speech was not protected under the rule set by *Garcetti. Mills,* 2006 U.S.App. LEXIS 15082, at *4-5. Judge Easterbrook, writing for a unanimous panel, noted that "Mills was on duty, in uniform, and engaged in discussion with her superiors" when she made the comments at issue. *Id.*

Similarly, Plaintiff was on duty at the dispatch center when he was involved in the discussions with his supervisors. The comments at issue requested help pursuant to an e-mail sent by Chief of Police DiVenere to the Bristol Police Department on November 29. (Pl.'s Rule 56(a)(2) Statement at ¶ 14.) According to Plaintiff's deposition testimony, he acted upon this email when he called for extra help due to the increased call volume on December 2. (Sweeney Dep. at 25:10-18.) The context and content of Plaintiff's requests clearly demonstrate that they were work requests made pursuant to official departmental policy, following the Chief of Police's November 29 e-mail.[FN12] Plaintiff was not speaking "as a citizen;" instead, his requests for assistance related to his "daily professional activities," which included ensuring that all incoming calls to the dispatch center were answered. *Garcetti,* 126 S.Ct. 1951, 164 L.Ed.2d 689, 2006 U.S. LEXIS 4341, at *22 ("Ceballos wrote his disposition memo because that is part of what he, as a calendar deputy, was employed to do. It is immaterial whether he experienced some personal gratification from writing the memo."); *see also Brewster v. City of Poughkeepsie,* No. 04CIV4204(CM), 2006 WL 1676143, at * 1-2 (S.D.N.Y. June 8, 2006) (holding that a police officer's speech was not protected when he wrote letters criticizing the police chief's decision to dismiss two traffic summons the officer had issued, because the plaintiff's speech was made pursuant to his professional duties). Moreover, the comments at issue in *Mills* involved overarching departmental policies and accordingly, the subject matter of these requests was arguably a matter of public concern. Because of the context in which they were offered and the plaintiff's work duties, however, the Seventh Circuit held that they were not protected. In this case, Plaintiff's comments did not address or criticize departmental policies in general, but instead constituted required work requests, necessitated by departmental protocol.

FN12. Even if the content of Plaintiff's requests for assistance can be construed as

complaints about under-staffing in the dispatch center (and the record does not support such a conclusion), these statements were still made pursuant to Plaintiff's official duties. Under *Garcetti,* this fact is dispositive. 2006 U.S. LEXIS 4341 at *21.

Subsequent decisions in the Seventh Circuit and elsewhere have followed the reasoning of *Mills* and set out a new test to guide constitutional interpretation of the protections accorded specific speech by a public employee. The *Mills* court interpreted the Supreme Court's holding in *Garcetti* as follows: before asking whether the subject-matter of particular speech is a topic of public concern, the court must decide whether the plaintiff was speaking "as a citizen" or as part of [his] public job. Only when government penalizes speech that a plaintiff utters "as a citizen" must the court consider the balance of public and private interests, along with the other questions posed by *Pickering* and its successors. **\*10** *Mills,* 2006 U.S.App. LEXIS 15082, at *4; see also Wilcoxon v. Red Clay Consol. Sch. Dist. Bd. of Educ.,* No. CIV. 05-524(SLR), 2006 WL 1793546, at *5 (D. Del. June 30, 2006) (setting forth a three-step analysis for public employees' First Amendment protected speech claims); *Logan v. Ind. Dep't of Corr.,* No. 04-CV-0797(SEB)(JPG), 2006 U.S. Dist. LEXIS 43631, at *3 (S.D. Ind. June 26, 2006) ("The effect of the holding in *Garcetti* is to add a new test in analyzing the employee's speech in determining whether it is protected under the First Amendment."); *Kodrea v. City of Kokomo, Ind.,* No. 1:04-CV-1843 (LJM)(WTL), 2006 U.S. Dist. LEXIS 42327, at *22-24 (S.D. Ind. June 22, 2006) (using a three-step analysis to analyze the plaintiff's First Amendment protected speech claim). Unlike the situation in *Kodrea,* the parties here do not directly address whether Plaintiff's requests for help were made pursuant to his official duties. 2006 U.S. Dist. LEXIS 42327, at *23-26.[FN13] However, it appears from the evidence in the record that these requests were made pursuant to his responsibilities as a dispatcher. Therefore, because Plaintiff's requests for assistance were not made as a citizen, but instead as part of his official duties, these statements are not protected and it is unnecessary to consider further First Amendment issues, such as the balance of public and private interests. *See Garcetti,* 126 S.Ct. 1951, 164 L.Ed.2d 689.

> FN13. In *Garcetti,* the parties did not dispute that the plaintiff's "speech" was made pursuant to his official duties, and as such, the Supreme Court did not need to articulate a framework for defining the scope of an employer's duties. *See* 126 S. Ct 1951, 164 L.Ed.2d 689, 2006 U.S. LEXIS 4341, at *26-27.

In sum, the Court finds that Plaintiff's confrontation with Defendant McIntyre regarding his conversation with Defendant Leone is not a matter of public concern, and that Plaintiff's two requests for assistance were made pursuant to his official duties. Consequently, Defendants are entitled to summary judgment on Plaintiff's First Amendment Claim.

### C. Equal Protection Claims

Plaintiff also claims, pursuant to 42 U.S.C. § 1983, that Defendants McIntyre and the City of Bristol violated his Fourteenth Amendment right to equal protection.[FN14] Specifically, Plaintiff alleges that after the incidents of December 2, 2004, Defendant McIntyre "singled out" Plaintiff for "harassment and adverse employment actions and has caused him to be subjected to scrutiny and harassment of a kind and degree not imposed upon any other employee of the Bristol Police Department." (Compl.¶ 21.) Although the Complaint is not entirely clear, it seems as though Plaintiff claims that the two-day suspension, together with Defendant McIntyre's other "harassment and adverse employment actions" since December 2, 2004, deprived Plaintiff of equal protection. ( *Id.* at ¶ 22.) Plaintiff alleges that these acts were done "either in retaliation for the plaintiff's exercise of protected constitutional rights; or maliciously and for the purpose of injuring the plaintiff; or in an intentional, arbitrary and irrational manner." ( *Id.*)

> FN14. The Complaint only names Defendant McIntyre in the equal protection claim, however, during the discovery process Plaintiff stated that he is also pursuing his equal protection claim against the City of Bristol. ( *See* Response to Interrog. No. 23.)

### 1. *Standard for Equal Protection Claims*

The Equal Protection Clause requires that the government treat all similarly situated people alike. *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Although equal protection claims typically involve discrimination against persons because of their membership in a vulnerable class, "the equal protection guarantee also extends to individuals who allege no specific class membership but are nonetheless subjected to invidious discrimination at the hands of government officials." *Harlan Assocs. v. Inc. Village of Mineola*, 273 F.3d 494, 499 (2d Cir.2001) (citing *LeClair v. Saunders*, 627 F.2d 606, 608-10 (2d Cir.1980)). An equal protection claim premised on this "class of one" theory may go forward "where the plaintiff alleges that [he] has been intentionally treated differently from others similarly situated and that there is no **rational basis** for the difference in treatment." *Harlan Assocs.*, 273 F.3d at 499 (quoting *Village of **Willowbrook** v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (per curiam)). Because Plaintiff does not assert membership in a protected class, his equal protection claim is based on a selective enforcement or "class of one" theory.[FN15]

> FN15. In opposing Defendants' Motion for Summary Judgment with regard to his equal protection claim, Plaintiff argues only that "it would be irrelevant whether or not there were probable cause to accuse him of a crime if, as his evidence shows, the asserted prohibition on turning on a microphone to overhear a conversation in the police department were being applied in an inconsistent manner for purposes of retaliation." (Pl.'s Mem. Opp. Summ. J. at 15 (citing *Farm Labor Organizing Committee v. Ohioi [sic] State Highway Patrol*, 308 F.3d 523, 533 (6th Cir.2002).)

**\*11** Three main instances of differential treatment discussed in Plaintiff's deposition and interrogatory responses appear to give rise to his equal protection claim. The first such instance is the two-day suspension from work without pay after the December 2, 2004 confrontation. ( *See* Responses to Interrog. Nos. 19 and 21.) This action seems to be the most significant for Plaintiff's equal protection claim, as evidenced by his argument in opposition to summary judgment, reproduced in note 15, *supra*. Second, Plaintiff asserts that a female citizen, prompted by Defendant McIntyre, brought a complaint against Plaintiff for allegedly inappropriate comments directed to her. (Sweeney Dep. at 71:1-75:4, Ex. A to Defs.' Rule 56(a)(1) Statement.) Finally, Plaintiff alleges that Defendant McIntyre attempted to replace him with another dispatcher to perform quality assurance work that he had been doing. ( *Id.* at 80:9-82:10.) The Court will consider each incident.[FN16]

> FN16. Plaintiff's Complaint states that the disparate treatment at issue occurred *after* the events on December 2, 2004 and therefore, the Court has no occasion to consider Plaintiff's allegations with regard to any events occurring prior to that date. ( *See* Sweeney Dep. at 75:18-80:1.)

### 2. *Selective Enforcement Based on Retaliation for Exercising First Amendment Rights*

To prevail on a claim of selective enforcement, Plaintiff must show both "(1) that [he was] treated differently from other similarly situated individuals, and (2) that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Harlan Assocs.*, 273 F.3d at 499 (internal quotations and citations omitted). Plaintiff's selective enforcement claim is based on two allegedly impermissible considerations: (1) retaliation for his exercise of First Amendment free speech rights, and (2) Defendants' malicious intent to injure him.

Plaintiff's selective enforcement claim is based in part on Defendants' alleged intent to retaliate for his speech. The selective enforcement claim alleges a specific reason for Plaintiff's suspension, i.e., retaliation for uttering constitutionally protected speech. Construing the facts in the light most favorable to Plaintiff, and for purposes of deciding this portion of Plaintiff's equal protection claim, the Court assumes, *arguendo*, that Plaintiff's speech, rather than the admitted eavesdropping, motivated the discipline or adverse employment actions. Therefore, Plaintiff's theory is not that Defendants'

actions were arbitrary or irrational, but that they were impermissible under the First Amendment. See *African Trade & Info. Ctr., Inc. v. Abromaitis,* 294 F.3d 355, 363 (2d Cir.2002).
As the Second Circuit has noted, where a plaintiff's equal protection claim is premised on an impermissible motive such as a First Amendment violation, the equal protection claim "coalesces" with the First Amendment claim. *Cobb v. Pozzi,* 363 F.3d 89, 110 (2d Cir.2004) (citing *African Trade & Info. Ctr.,* 294 F.3d at 363). Accordingly, Plaintiff must prove that Defendants treated him differently because he exercised constitutionally protected First Amendment rights. The Court's holding that Plaintiff's speech is not constitutionally protected, however, requires that summary judgment be granted on Plaintiff's selective enforcement claim, to the extent that the claim is based upon alleged retaliation for his speech. See *Cobb,* 363 F.3d at 110; *African Trade & Info. Ctr.,* 294 F.3d at 363; *Levesque v. Town of Vernon,* 341 F.Supp.2d 126, 138-39 (D.Conn.2004) ("Levesque's selective prosecution equal protection claim fails because it is derivative of her First Amendment retaliation claim, which, as discussed herein fails as a matter of law.").

### 3. *Selective Enforcement Based on Malicious Intent to Injure*

**\*12** In the alternative, Plaintiff makes a "class of one" equal protection claim, arguing that he was treated differently from other similarly situated dispatchers based on either a malicious intent to injure him or intentionally, and with no rational basis for such differential treatment. Plaintiff, to succeed on this "class of one" claim, must establish: "(1) that he was treated differently than others similarly situated, and that this disparate treatment was (2) irrational and wholly arbitrary and (3) intentional." *Barton v. City of Bristol,* 294 F.Supp.2d 184, 195 (D.Conn.2003) (citing *Giordano v. City of New York,* 274 F.3d 740, 751 (2d Cir.2001) (internal citation omitted)); accord *Olech,* 528 U.S. at 564. Prior to the Supreme Court's decision in *Olech,* a plaintiff bringing a selective enforcement claim in the Second Circuit was required to show that: "(1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Giordano,* 274 F.3d at 750-51 (2d Cir.2001). Following *Olech,* the Second Circuit has thus far declined to resolve whether a selective enforcement or "class of one" plaintiff is still required to show malice or bad faith (i.e., "improper motivation") or whether such a claim can be supported merely by a showing of irrational and wholly arbitrary conduct combined with intentional disparate treatment. See, e.g., *Bizzarro v. Miranda,* 394 F.3d 82, 88 (2d Cir.2005); *Giordano,* 274 F.3d at 751; *Harlan Assocs.,* 273 F.3d at 499-500; [FN17] see also *Longmoor v. Nilsen,* 329 F.Supp.2d 289, 296-97 (D.Conn.2004) (providing an overview of the mixed Second Circuit opinions on the issue).

> FN17. The *Harlan* court assuming, *arguendo,* that malice is no longer required, wrote that "a 'class of one' plaintiff could survive a summary judgment motion by ⋯ [showing] either that there was no rational basis for the unequal treatment received ⋯ or that the [unequal treatment] was motivated by animus." 273 F.3d at 500 (citation omitted).

Plaintiff claims that he was treated differently than other similarly situated dispatchers based on a malicious intent to injure him. (Compl.¶ 22.) Defendants contend that Plaintiff has failed to identify others who are similarly situated to him in all material respects. (Defs.' Mem. Supp. Mot. Summ. J. at 17-18.) Plaintiff raises nothing in his brief opposing Defendants' motion for summary judgment on the equal protection claim in this regard.
With regard to his two-day suspension, Plaintiff asserts in his deposition and Interrogatory Response Number 25 that other dispatchers and officers accessed the intercom system and listened in on conversations. ( See Sweeney Dep. at 116:19-23.) Plaintiff fails, however, to identify any specific persons or instances of such conduct:
A: I don't recall which officer and at which time [the eavesdropping] was done. I mean, it was done throughout the course of a day or a shift. I can't remember any specific time or specific incident in which it happened.
Q: You have no specific recollections of other officers or other dispatchers using the intercom system to listen to conversations between other officers?
**\*13** A: Correct.
( *Id.* at 119:17-24.) Plaintiff's argument is, essentially, that because these other unidentified

individuals were not disciplined for violations of intercom usage policies, the fact that he was disciplined demonstrates personal animus towards him.

In order to state a selective enforcement claim under the Equal Protection Clause, Plaintiff must come forth with evidence comparing himself to individuals that are "similarly situated in all material respects." *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir.2000) (internal citations omitted). In order to satisfy the "all material respects" standard, a plaintiff must show that his co-employees "were subject to the same … evaluation and discipline standards" and that those similarly situated co-employees "who went undisciplined engaged in similar conduct." *Id.* at 40 (citing *Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 96 (2d Cir.1999); *Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 64 (2d Cir.1997)). Ordinarily, whether other employees are similarly situated is a factual issue that should be submitted to a jury, but "[t]his rule is not absolute … and a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met." *Harlan Assocs.*, 273 F.3d at 499 n. 2.

The relevant inquiry is whether other dispatchers or officers were undisciplined or received less discipline for engaging in similar conduct. FN18 The Court finds that Plaintiff has failed to produce evidence, with regard to his two-day suspension, of the existence of any similarly situated employees.

> FN18. Construing the facts in the light most favorable to Plaintiff, the Court will assume for the purposes of departmental policy regarding intercom usage, that the rules and restrictions apply equally to officers and dispatchers and that all employees who violate those rules are subjected to the same discipline.

First, Plaintiff has no specific recollection of other dispatchers or officers using the intercom to listen in on conversations between officers when he was present, but claims to have heard from other employees that others had engaged in the conduct at issue before he did so. (Sweeney Dep. at 116:14-117:17.) The Second Circuit has held that a plaintiff need not identify in his complaint specific instances where others have been treated differently for purposes of equal protection, and a conclusory statement can be sufficient. *DeMuria v. Hawkes*, 328 F.3d 704, 707 (2d Cir.2003). *DeMuria*, however, involved a motion to dismiss, and the court noted that the conclusory allegations were "sufficient, *albeit barely*, to meet the minimal level established by *Olech* for 'class of one' equal protection claims at the pleading stage." *Id.* (emphasis added). At the summary judgment stage the Second Circuit has held that conclusory statements alleging that other employees were similarly situated and went undisciplined may not be sufficient. *Shumway*, 118 F.3d at 64. The employee in *Shumway*, like Plaintiff, admitted that she had "no personal knowledge of the alleged violations but heard about them because they were 'common knowledge.' " *Id.*

Second, in order to show that others are similarly situated in all material respects, Plaintiff must introduce evidence of some other employee(s) who used the intercom to listen in on a conversation between two police officers, and subsequently confronted one of the officers about the conversation. Plaintiff fails to do so, and accordingly, no reasonable jury could find that he meets the similarly situated prong with regard to the two-day suspension. Whether a person is similarly situated "in all material respects" varies from case to case, but it "must be judged based on … whether the conduct for which the employer imposed discipline was of comparable seriousness" to the conduct of others similarly situated. *Graham*, 230 F.3d at 40. Plaintiff has failed to produce any evidence showing that other employees engaged in misconduct of comparable seriousness, or that Defendants knew about and ignored other violations of the intercom policy. *See Shumway*, 118 F.3d at 64-65.

**\*14** Even if Plaintiff could satisfy the "similarly situated" prong of his selective enforcement claim, he has failed to proffer sufficient evidence of malice. Plaintiff does not point to any facts in the record that either show malice or that could permit a jury to infer malice from the actions of Defendant McIntyre or the City. Rather, his claims are based solely on conjecture and speculation. Defendant McIntyre was receptive to Plaintiff's requests for assistance on December 2. He decided to press for an investigation only after Plaintiff admitted that he had overheard Defendant McIntyre's private conversation with Defendant Leone, and after Plaintiff confronted him about that conversation in front of other dispatchers. In fact, before Plaintiff confronted Defendant McIntyre about his conversation with Defendant Leone, McIntyre spoke with Leone to ensure that in the future, when a dispatcher called for assistance in the dispatch center, Defendant Leone would visit the center in person to evaluate the situation. (Leone Aff. at ¶¶ 8-9; *see also* Britt Report at SWEENEY 000033.) "If the motivation to punish is to secure compliance with agency objectives, then by definition the motivation

is not spite, or malice, or a desire to 'get' [someone] for reasons wholly unrelated to any legitimate state objective." *Bizzarro,* 394 F.3d at 87 (quoting *Esmail v. Macrane,* 53 F.3d 176, 180 (7th Cir.1995) (internal quotations omitted). Disciplinary charges alone cannot supply the requisite evidence of malice, because "plaintiffs must prove that the disparate treatment was *caused by* the impermissible motivation. They cannot merely rest on a showing of disparate treatment." *Bizzarro,* 394 F.3d at 87-88 (internal citations omitted) (emphasis in original). Plaintiff has not brought forth any evidence that might support a finding of malice with regard to the two-day suspension.
With regard to the other incidents that constitute Plaintiff's claim of selective enforcement based upon malice or an intent to injure, the Court also finds insufficient facts in the record to support "class of one" claims based upon them.FN19 First, as stated above, Plaintiff must show others similarly situated to him in all material respects. *Graham,* 230 F.3d at 39-40. In the case of Ms. Talit's complaint against Plaintiff for inappropriate conduct, Plaintiff fails to show that in other situations where a citizen approached Defendant McIntyre with possible criminal charges against a city employee, McIntyre did not encourage the citizen to file a complaint. Plaintiff does not allege that Defendant McIntyre encouraged Ms. Talit to make her complaint based on malice or intent to injure Plaintiff. There is no evidence of an impermissible reason for Defendant McIntyre's actions. Furthermore, after the complaint was filed, the department conducted a professional investigation and decided that discipline was not appropriate. (Sweeney Dep. at 73:8-17.)

> FN19. As outlined *supra,* Plaintiff asserts two other incidents that he alleges constitute equal protection violations. First, Plaintiff claims that due to Defendant McIntyre's encouragement, a female citizen brought a complaint against Plaintiff for allegedly inappropriate comments he made to her. This complaint did not result in discipline and Plaintiff concedes that Defendant McIntyre did not encourage her to file a *false* complaint. Second, Plaintiff alleges that Defendant McIntyre attempted to replace him with another dispatcher to perform the quality assurance work. It is undisputed, however, that the decision was not actually implemented.

**\*15** With regard to the quality assurance work, Plaintiff alleges that he was retaliated against when Defendant McIntyre attempted to replace Plaintiff with another employee to perform his quality assurance duties. ( *See* Response to Interrog. No. 20.) Plaintiff, however, never actually lost any quality assurance responsibilities or pay. (Pl.'s Rule 56(a)(2) Statement at ¶ 64.) Plaintiff's claim fails for two reasons. First, Plaintiff fails to proffer any evidence of similarly situated employees who were not subjected to this type of "interference." Second, Plaintiff stated in his deposition that he "did not understand why Captain McIntyre was making this change." (Sweeney Dep. at 82:7-10, Ex. A to Defs.' 56(a) Statement.) Any claim that Defendant McIntyre's attempt to replace Plaintiff was motivated by malice or personal animus is purely speculative. The email notifying Plaintiff of Defendant McIntyre's intention to take away quality assurance duties stated that he wanted to see what the new scores would look like with a different employee. (Pl.'s Rule 56(a)(2) Statement at ¶ 64 .) These facts, without more, are not sufficient to support an inference of malice. Consequently, Plaintiff's selective enforcement claim based upon malice or intent to injure fails and Defendants are entitled to summary judgment on this issue.

### 4. *Intentional and Irrational Selective Enforcement*

Plaintiff also alleges that Defendants singled him out for discipline intentionally and with no rational basis. (Compl.¶ 22.) To prevail on this claim, Plaintiff must show "(1) that he was treated differently than others similarly situated, and that this disparate treatment was (2) irrational and wholly arbitrary and (3) intentional." *Barton,* 294 F.Supp.2d at 195 (internal citations omitted).
The Court's determination that Plaintiff cannot demonstrate that others were similarly situated in Section II.C.3 *supra* is equally dispositive in this analysis. A "class of one" claim based on *Olech,* 528 U.S. 562 (2000), requires a greater showing of similarity than the standard for a claim alleging differential treatment for an impermissible reason. *See Neilson v. D'Angelis,* 409 F.3d 100, 104 (2d Cir.2005). In order for Plaintiff to prevail on this claim, he must show an "extremely high" level of similarity between himself and the persons with whom he compares himself. *Id.* Therefore, without more evidence of others similarly situated, Plaintiff's "class of one" equal protection claim must fail. Even if Plaintiff could demonstrate that others were similarly situated in all material respects, he still

is unable to demonstrate that Defendants' actions were irrational or wholly arbitrary. A government official's "decision can be considered irrational only when [the official] acts with no legitimate reason for [his or her] decision." Harlan Assocs., 273 F.3d at 500; Levesque, 341 F.Supp.2d at 138 (holding that "the fact that Levesque's supervisor believed that Levesque was uncooperative when working with him is a rational basis to treat Levesque differently than [a co-worker]"). The question here is not whether Defendants' actions were "correct," but whether there was a rational basis and/or legitimate reason for acting as they did. See Bizzaro, 394 F.3d at 88 (holding that "Olech does not empower federal courts to review government actions for correctness").

*16 In the case of Plaintiff's two-day suspension without pay, a rational person could have imposed such a sanction based upon Plaintiff's admitted eavesdropping on Defendants McIntyre and Leone and his subsequent confrontation with Defendant McIntyre in front of other dispatchers. The reasons for this adverse employment action are clearly outlined in the Affidavit of Diane Ferguson, Acting Director of Personnel for the City of Bristol, ( see Ex. F to Defs.' Rule 56(a)(1) Statement), as violations of Work Rules 2 and 8. Defendant McIntyre decided to take action against Plaintiff because he was "stunned" by Plaintiff's admitted use of the intercom system to listen in on his conversation. ( See McIntyre Aff. at ¶ 5, Ex. H to Defs.' Rule 56(a)(1) Statement.) Similarly, Defendant McIntyre had a legitimate reason to encourage Ms. Talit to proceed with her complaint against Plaintiff for his alleged improper actions towards her. A police officer certainly has a legitimate governmental objective in encouraging citizens to make a criminal complaint in certain circumstances. Plaintiff does not allege that Defendant McIntyre encouraged Ms. Talit to do so falsely or erroneously and it is not for this Court to evaluate the strength of Ms. Talit's allegations.

With regard to Defendants' attempted removal of Plaintiff from his quality assurance duties, Lieutenant Estes told Plaintiff that he was being replaced by another employee because they wanted her "to handle [the] program to see what the new scores would look like[.]" (Sweeney Dep. at 80:13-14.) Plaintiff states that he was not aware of any problems with the quality assurance program and that people's scores were improving because of it. ( Id. at 82:4-10.) He "did not understand why Captain McIntyre was making this change." ( Id. at 82:9-10.) Although this statement arguably presents an issue of fact about whether Defendant McIntyre's actions were irrational or arbitrary,[FN20] Plaintiff still has failed to proffer any evidence that there were others similarly situated who were not subjected to such "harassment," as is necessary to state a valid "class of one" equal protection claim.

> FN20. Indeed, "[i]f a jury could reasonably find that there was no rational basis for the defendants to believe that initiating [an adverse action] against [Plaintiff] could serve the legitimate goals of the [department], a claim would lie." Bizzarro, 394 F.3d at 89.

Finally, the Court notes that Plaintiff must show that Defendants' allegedly arbitrary disparate treatment was intentional. Plaintiff cannot demonstrate, however, that Defendants treated similarly situated employees differently when there is no evidence that Defendants knew about allegedly customary use of the intercom system to listen in on private conversations throughout the police station. See Shumway, 118 F.3d at 64-65. Plaintiff did not report any of the alleged violations and he does not indicate that others may have reported such incidents to Defendant McIntyre or other personnel. The failure to offer such evidence is fatal to the "class of one" claim, as it is based solely upon Plaintiff's speculation.

### III. CONCLUSION

The Court has considered Plaintiff's claims and finds them insufficient to survive Defendants' motion for summary judgment. Because Plaintiff's speech was not a matter of public concern, it is not protected speech under the First Amendment. Consequently, any Equal Protection claim based upon retaliation for this speech is derivative of the First Amendment claim and also must fail. Furthermore, Plaintiff's "class of one" claim fails as a matter of law because Plaintiff is unable to demonstrate that there were others similarly situated in all material respects. Finally, conclusory statements alleging malice are not sufficient to defeat summary judgment and a rational basis exists for Defendants' allegedly disparate treatment. Accordingly, Defendants' Motion for Summary Judgment [Doc. No. 25] is **granted.** The clerk shall close the case.
*17 SO ORDERED.
Copr. (C) West 2006 No Claim to Orig. U.S. Govt. Works D.Conn.,2006.

Sweeney v. Leone
Slip Copy, 2006 WL 2246372 (D.Conn.)

END OF DOCUMENT

(C) 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.